UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION - BAY CITY

IN RE:

    THOMAS J. PLACHTA,                             Case No. 12-21037-dob
                                                                   Chapter 7 Proceeding
                Debtor.                               Hon. Daniel S. Opperman
_____/

GARY ZARKOWSKI,

                Plaintiff,

v.                                                                     Adversary Proceeding
                                                                    Case No. 12-2120-dob

THOMAS J. PLACHTA,

                Defendant.
_____/

## OPINION GRANTING PARTIAL SUMMARY JUDGMENT IN FAVOR OF PLAINTIFF

### Procedural History

The Plaintiff, Gary Zarkowski ("Plaintiff"), filed this adversary proceeding seeking a determination that a default judgment entered in his favor by the Montcalm County Circuit Court is excepted from discharge. The Plaintiff originally filed a Motion for Entry of Default Judgment, which the Court considered as a Motion for Summary Judgment, and an oral argument was heard on the Plaintiff's Motion. At that hearing, the Court determined that a discrete issue of fact existed as to the intent of the Defendant. Accordingly, the Court conducted an evidentiary hearing on April 25, 2013, and heard the testimony of the Defendant, Thomas Plachta ("Defendant"). For the reasons stated in this Opinion, the Court concludes that the Plaintiff's Motion for Summary Judgment should be granted in part, but that an issue remains as to the exact amount of damages owed to the Plaintiff.

Jurisdiction

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 157, 28 U.S.C. § 1334, and E.D. Mich. LR 83.50. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I) (determinations as to the dischargeability of particular debts). All issues before the Court arise out of Title 11 of the United States Code and do not involve issues which limit this Court's jurisdiction as raised in the cases of *Stern v. Marshall*, 131 S. Ct. 2594 (2011) and later by the Sixth Circuit Court of Appeals in *Waldman v. Stone*, 698 F.3d 910 (6th Cir. 2012).

Facts

The Defendant represented the Plaintiff's ex-wife, Michelle Parker ("Parker"), in a lawsuit in the Montcalm County Circuit Court, Case No. 06-H-7317-CZ ("Circuit Court Case No. 1"). Circuit Court Case No. 1 was a claim by Ms. Parker against various defendants for monies owed by the defendants. Circuit Court Case No. 1 was set for case evaluation.[1] As a part of this process, prior to a case evaluation hearing, the parties are to submit checks to pay the three case evaluators and a case evaluation summary so the three case evaluators may review that summary and be advised as to the position of each party. A case evaluation hearing is held, and counsel for each party appears and gives a brief summary of its position. The case evaluators consider the case and then give their opinion as to the settlement value of the lawsuit.

In Circuit Court Case No. 1, the Montcalm County Circuit Court entered an order setting forth the specific requirements of each party, namely the payment of the fees, the submission of the summaries, and the attendance at a hearing. The Court's order states that a case may be dismissed

---

[1] As subsequent portions of the transcripts indicate, this process is also commonly known as mediation or ADR. For the sake of consistency, the Court will consider all three as the same.

or a default judgment may be entered against a party for failure to comply with the Court's order.

The Defendant did not timely pay the case evaluation fees or submit a case evaluation summary in Circuit Court Case No. 1. As the Defendant testified on April 25, 2013, his practice varied as to the payment of the fees and the submission of the case evaluation summaries, which often was dependent upon the nature of the case and the tactical advantage that may or may not be gained by the late submission of a case evaluation summary.

In Circuit Court Case No. 1, the Defendant contacted opposing counsel the day before the scheduled case evaluation hearing to request an adjournment of that case evaluation hearing because discovery was not completed. Opposing counsel refused that request. Later that day, the Defendant's father-in-law fell ill and was sent to the emergency room in Mt. Pleasant and then was transferred to Lansing for medical treatment. The Defendant's wife spent that night and the next day with her father, leaving the Defendant with their minor children. On the day of the case evaluation, the Defendant contacted the Circuit Court to advise the Court of his situation.

The defendants in Circuit Court Case No. 1 sought dismissal of Parker's complaint, and the vehicle to make that determination was an order to show cause for contempt before the Montcalm County Circuit Court. The Montcalm County Circuit Court conducted a hearing on June 15, 2007, to consider the request of the defendants. After explaining the medical emergency to the Court, the Defendant stated the following, which prompted further questioning by the Court:

> MR. PLACHTA: . . . If the Court feels that I have not lived up to the standard that's one thing, but I would certainly ask the Court not to dismiss my client's case.
> THE COURT: Looking at the Court file, the file also reflects that prior to that time you never paid the case evaluation fees or submitted the required brief.
> MR. PLACHTA: It was my intention to pay the medication [sic] fee on the day of the mediation and if the Court certainly feels that I am obligated for those, and it appears the Court does, I'd be happy to pay those and of course that would be my

3

responsibly [sic] not my client's.

       THE COURT: What about the brief?

       MR. PLACHTA: I'd be happy to file a brief as well.

       THE COURT: Did you do a brief?

       MR. PLACHTA: I did a brief but did not file a brief. I was intending on filing it on the morning of the mediation.

       THE COURT: I also have notes from the Court Administrator that she after the case evaluation date had requested an affidavit of verification from your office as to who was sick, where, doctor's slip, those type of things. Many times when we receive that information then we don't need to pursue a possible contempt. Is there a reason why that information was not provided?

       MR. PLACHTA: Yes, had it been my personal information I would have been happy to provide it to the Court. At the time that we received the request for that information, which was I believe on the Friday following the medication [sic], I'm not sure if that was the exact date but it was within days of the mediation that I didn't attempt and I think two dates later.

(Tr., Page 4, Lines 4 - 25; Page 5, Lines 1 - 10)

       THE COURT: . . . The case evaluation notice does provide that non-payment of case evaluation fees may result in an order to show cause for contempt, dismissal or judgment for the adverse party. It also requires that at least fourteen days before the case evaluation hearing that each party serve one copy of the case evaluation brief on each case evaluator and attorney/party of record and file proof of service with the Montcalm County Clerk.

       What I'm going to do at this point in time is continue this hearing. Mr. Plachta, I do need some type of written verification with regards to your representations today.

(Tr., Page 7, Lines 6 - 18)

       THE COURT: For example, a copy of the brief showing that it had been done and was ready for you to take it with you on the day of the case evaluation. I would think that also there could be or should be copies of the checks or something like that. I guess it is possible that you waited until the morning of to have them wrote. And then I do need something to corroborate your father-in-law's illness. I don't know that I necessarily need something from him or his doctor but something so that we can verify that what you're saying is true. This is probably, well it is the first one that I can remember that we've taken it to this extent with an attorney. We've had instances before where in pro parties don't comply and cases have been dismissed or judgments entered. But my hesitancy in just automatically accepting Mr. Plachta's representation is that there was no compliance with the case evaluation procedures. If the checks would have been submitted or the briefs submitted then I

4

would find it much easier to accept that there was this family emergency. Without any compliance otherwise, I do think in fairness need to ask for some verification. The issues are two fold, one is to whether plaintiff's complaint should be dismissed as to Mr. Mierendorf's client and then if it is or even if it is not, whether there should be costs or fees to reimburse the case evaluators and Mr. Mierendorf for his cost. So we will adjourn this for another date and then I would like to have seven days prior to that hearing a written verification. Mr. Plachta, any questions?

    MR. PLACHTA: No, thank you, your Honor. We appreciate the Court's consideration.

(Tr., Page 7, Lines 20 - 25; Page 8, Lines 1 - 25)

    MR. PLACHTA: . . . In any event I certainly will comply with the Court's direction and make sure that the Court has that information.

(Tr., Page 9, Lines 17 - 19)

The Montcalm County Circuit Court conducted the second hearing on August 14, 2007. Pertinent portions of this hearing include:

    MR. PLACHTA: This is a copy of the ADR summary that I had ready to file. Basically what it consists of is the summary, the — the count two in the — I'm sorry I apologize, I can't do two things at once. Basically refers to count two in the complaint, which is a complete statement of basically what happened here etcetera, etcetera, as well as the copy of the contract between the two parties. So that was ready to be filed. There's also an affidavit from my wife who is the Isabella County Probate Court Register I am proud to say and am proud to say she's my wife, but in any event, indicating exactly what happened on the date of or the evening before and then the day of the mediation.

(Tr., Page 4, Lines 1 - 13)

    THE COURT: Well, it's just that the Court rules are very specific as to what language needs to be in the affidavit if you're going to use an alternative to a notary. At any rate for what the documents are worth, I will go ahead and accept plaintiff's proposed exhibit number one. The objections are more as to form then substance.

(Tr., Page 6, Lines 7 - 13)

    THE COURT: When was this ADR summary prepared?
    THE WITNESS: It was prepared the day before and I was going to hand deliver it at the time of the ADR, the day before the ADR hearing.
    THE COURT: Why have you not yet paid the case evaluation fees?
    THE WITNESS: I wanted to see what the outcome was of the Court's

5

decision. Certainly I owe them. I'm not in anyway saying those fees aren't owed.
           THE COURT: Mr. Mierendorf, any questions or comments?

(Tr., Page 8, Lines 20 -25; Page 9, Lines 1 - 5)

           [MR. MIERENDORF]: So you choose not to come to the mediation?
           [THE WITNESS]: I choose first, counsel, to contact your office to indicate that there was a medical emergency in my family and to ask if you would do me the courtesy of postponing the hearing because of that. That was the first thing I did, then I — once the hearing wasn't going to be adjourned, which surprised me that you wouldn't extent [sic] that courtesy to me, that's your choice —
           THE COURT: Mr. Plachta, are you talking about the day of the case evaluation or the day before?
           THE WITNESS: The day of the case evaluation.
           THE COURT: And Mr. Mierendorf, you talked with Mr. Plachta on the day of the case evaluation?
           MR. MIERENDORF: Absolutely not, your Honor. The case evaluation was at 8:30 in the morning. My office doesn't even open until 9:00 o'clock and my office didn't get any phone calls and never has he contacted me and requested an adjournment because of that.
           THE WITNESS: Judge, you have the transcript —
           THE COURT: Mr. Plachta, you're digging a hole for yourself. I've got your prior transcript testimony where we discussed the same incident and Mr. Mierendorf, said well he never contacted me about the emergency and then you appropriately told him, well it didn't happen until that night. And now for you to tell that you talked to Mr. Mierendorf about the emergency, is contradictory to your prior testimony and I don't think it's true.
           THE WITNESS: My — Judge, my recollection is that I called my office and ask [sic] that they contact Mr. Mierendorf's office. I did not call directly. I was with my kids.
           THE COURT: But again, see that's even now a little bit different then what you just said. Mr. Mierendorf, any other questions or comments?
           MR. MIERENDORF: I guess there was nobody — I have no further questions, I have a few comments.

(Tr., Page 10, Lines 10 - 25; Page 11, Lines 1- 21)

           THE COURT: Mr. Plachta, any further remarks?
           MR. PLACHTA: Yes, I just want to take opposition to the Court's believing that I've lied or mislead the Court. I may not have not remembered the situation about when the call was made and things of that nature but I believe that I was trying to comply with the Court's order. If the Court feels that I have acted contemptuously and that's of course the Court's decision not mine, if the Court feels that way, the Court should not apply that to my client. If the Court feels that I have acted contemptuously to the Court by anything that I've done, which I don't believe that

6

I have but that's again that's the Court's decision, then the Court should sanction me rather than sanctioning my client. Thank you, your Honor.

(Tr., Page 14, Lines 11 - 25)

      THE COURT: . . . I'm sorry, I don't know that I've ever done this before but I don't believe that the two page ADR summary submitted by Mr. Plachta today was prepared for the case evaluation, as indicated by Mr. Plachta. The paper work is very clean, very white and as such even though I am no expert, it does appear to be freshly done. It's not dated. It in essence is one, two, three, four, five, six, seven sentences. If that was his case evaluation brief then it did not comply with the Court rules and it makes more since [sic] as Mr. Plachta indicated to Mr. Mierendorf and as his secretary told the Court administrator that he was not doing one. It would then seem to make since [sic] that this is an effort to appease the Court.

(Tr., Page 15, Lines 22 - 25; Page 16, Lines 1 - 9)

      THE COURT: . . . I am going to order that the case against Mr. Mierendorf's client's [sic] be dismissed, that being defendant Denman. I am not doing so because of the medical emergency or whether that did or did not take place. I will assume for purposes of this hearing that there was a medical emergency that took place in the evening hours of April 23 and was in existence on April 24, 2007. Even though Ms. Plachta's affidavit does not comply with the Court rules, I am unwilling at this point to say that either she has [sic] a Probate Register for Isabella County is being untruthful or that Mr. Plachta is being untruthful with regards to the circumstances surrounding his wife's father. The reason why I am dismissing this case is because one, the case evaluation fees were not paid as required by the case evaluation procedures, two the brief was not submitted, three the case evaluation fees have still not been paid, four Mr. Plachta did not comply with the Court's request and I do note from the case evaluation file that on June 14, 2007 the ADR clerk in communication with Mr. Plachta's office requested that he pay the case evaluation fees and provide an affidavit and doctor's statement. That was not done for the June 15 hearing. It was not done for today's hearing other then this purported affidavit from Ms. Plachta. I also find that Mr. Plachta was not truthful today with regards to his representations that he had asked Mr. Mierendorf for an adjournment because of the medical emergency. That clearly did not take place. I also don't find that when he requested of the Court an adjournment on April 23 that it was with regards to the medical emergency. . . . the reason why I am dismissing this case is because of the non-payment of the fees, the non-compliance with the brief requirements and the non-compliance with this Court's request so far as documentation substantiating the medical emergency, the unbelievable testimony today so far as conversations with Mr. Mierendorf.

(Tr., Page 17, Lines 2- 25; Page 18, Lines 1 - 6 and Lines 14 - 20)

7

Subsequently, one of the plaintiffs in Circuit Court Case No. 1, Michelle Parker, the Plaintiff's ex-wife, transferred and assigned her rights and causes of action against the Defendant to the Plaintiff. The Plaintiff filed a second lawsuit in the Montcalm County Circuit Court, Case No. 08-H-11146-NM ("Circuit Court Case No. 2") and served a copy of the summons and complaint upon the Defendant. The Defendant failed to answer the complaint and a default was taken against him in Circuit Court Case No. 2. The Montcalm County Circuit Court conducted a hearing on the Plaintiff's motion for default judgment and awarded actual damages of $100,012.46 arising from the failure of the Defendant to take certain actions in Circuit Court Case No. 1 that would have been collected had the Defendant acted properly and exemplary damages of $500,000. The Montcalm County Circuit Court awarded the exemplary damages from the following statements, which led that Court to conclude as it did:

> THE COURT: . . . Let's then talk about paragraph number four and your request for exemplary damages. What can you tell me there?
> THE PLAINTIFF: Well, Your Honor, I did attach a statement, basically, as Exhibit 6, that outlines the situation. There were, you know, many – you were the – you presided over this case, of course, and may or may not remember some of the – some of the things that went on. The most egregious item, I believe, that Mr. Plachta did that resulted in the second count being dismissed completely, was that he had failed to appear at a – at a evaluation – case evaluation, and, of course, there were two contempt hearings on that. He was asked to produce proof of – of the reason why he wasn't there, and I think it was pretty clear from a read of the transcript, or for anybody that was there, that he was quite dishonest with the Court. And I don't know – that wasn't the stated reasons I don't think, why the case was dismissed. There was actually I think four reasons why the case was dismissed, to that he didn't appear at the – the evaluation in the first place, he didn't provide what the Court requested, and a couple other technical reasons why they dismissed it. But again, it was very aggravating, very frustrating situation to be, you know, his client in a pretty open and shut, in my view, contract dispute. And for our case to just get dismissed for – for that kind of behavior and to have to set [sic] through it, not on one but on two occasions.
>
> The other count was pretty much torpedoed for us, I guess you would say. Earlier when he – we actually – the – the company in the first count, Badge Boyz, LLC, actually defaulted. He never received a default judgment, or never filed and went through the process of getting a default judgment against em (sic). And the

8

individuals in the case, which would have been re – really the only collectable parties anyway, I don't believe we could have collected, maybe would could've, but we – collecting a full amount against individuals would've been a lot easier, in my view, than the company. But, in any case, they – the case was dismissed against the individuals because they were – they were residents of Indiana. And – and they actually did not file an answer or their – well, they did not receive – or they did not get representation in the case until about six months after we filed. So we actually tried to get a default against em (sic). They did finally get representation, and argued the case should be dismissed because they were Indiana residents and we should've filed there.

And there is actually a dispute in some of the paperwork that at one place it does say that it should be litigated in Indiana, and that's what the Court was shown, and that's what the Court ruled on when they dismissed it against them. However, in the actual note agreement, which I have attached again to the documents, it clearly states Michigan jurisdiction. And that was an oversight on the attorneys, I'm assuming, that drew up the original paperwork. But Mr. Plachta failed to argue, even appear, or argue, or file, any pleadings to the Court stating that, you know, we have that discrepancy, we filed in Michigan, and it should stay in Michigan, we have just as much right to sue in Michigan as – as anybody would in Indiana because you really have these two competing agreements, both signed by all parties, where did they actually agree. And he actually – one of my exhibits is actually a letter – exhibit to the original complaint, is a letter from Mr. Plachta to my then wife, stating that – that we would win. He was confident that we would win on that issue, and that is Exhibit 5 attached to the original complaint. And a November 29th 2006 letter from Mr. Plachta, he says in regards to both motions filed by the other party – one of em (sic) was to set aside the default judgment against the company, I believe, and we did prevail on that one, I believe. And the other was to not get the case dismissed against individuals, and we did lose on that – on that account. And my belief is, is because the Court was never made aware that the actual note agreement called for Michigan – I hope I'm using the right term, but Michigan jurisdiction, that the Court – that this should be argued in Michigan Court.

So, effectively, our – our whole case, count one and two, between these two errors was – was – went away, because of, I think, this blatant error on – on Mr. Plachta's part. Also, he was – he was impossible to get a hold of toward – especially, towards the end of this process. We would write letters, half dozen letters, or phone calls that would never be returned. He would – he would never answer letters even though he had sent letters with these questions that we had concerning when is this judge – when is this default judgment gonna (sic) for, when is, you know, this gonna (sic) happen, and we'd seldom, if ever, get responses. He would set phone conferences where, you know, okay, we finally get to talk to you to make these questions – get these questions answered, and then he would not be available. We'd call his office, and they'd tell us, oh, he had to go into court or some excuse, and we'd never get em (sic) answered.

And then of course, in earlier – last year, then of course, the – the cases were completely dismissed, or finally went away all together, is my understanding, for

9

non-progress. Of course, at that point there wasn't much left. The case against individuals in count one was already dismissed, and count two was already dismissed completely because of the contempt issue.

THE COURT: How has this then affected you, so far as your reputation, both personally and professionally?

THE PLAINTIFF: Well, certainly, going through this process – I'm a CPA in Greenville, also a financial advisor in Greenville, I've – I consider myself a–a–a–other professionals I – I know and work with in different capacities – the attorneys on the other side I've – knew both of em (sic) and have worked with em (sic) in – in different capacities as – in my own profession. I just feel that it, certainly, has tarnished me, personally and professionally as an individual, having that type of representation in – in that context.

Cert – the – the other issue, which I don't know if it comes to bear or not and there are certainly many issues as to why, but I actually divorced during this period, and the – the strife that me and my wife had during this case, certainly and in hindsight, maybe was – things that wasn't my fault, wasn't her fault, was in hindsight Mr. Plachta's fault, grinded on us and I think hastened the end of our marriage. And granted, we had – we had problems other than that, obviously, but – but that certainly didn't help to have this yearlong, almost two yearlong process, where we were grinding through this – this case where we feel – felt that we were wronged again and again. We have a simple contract – what we feel anyway, I felt, was two simple contract disputes that should be pretty straightforward for an attorney to win by presenting the evidence as we outlined it here – as I outlined it here. And in – but yet we grind through a year and a half and – and all we have to show for it is – is at the end a lot of humiliation and – and dis – a couple of dismissals, or a dismissal of the – of the case.

THE COURT: Anything else you wanted to say so far as your request for exemp – exemplary damages?

THE PLAINTIFF: No, Your Honor.

THE COURT: The Court, then, will award exemplary damages in the amount of $500,000.00. It's difficult, in the sense that I mean no disrespect to Mr. Plachta. Prior to this case he had, I think, a better than average reputation so far as representing clients in appearing before this Court. However, in the case described by plaintiff, Mr. Plachta's conduct failed to even meet minimal standards so far as one, what one would accept or expect from an attorney, let alone one with the expertise and experience of Mr. Plachta.

As pointed out by plaintiff, there were even very minimal things that he should have done, did not do, and adversely affected the case for which he was hired to represent plaintiff. The example is there, that note, I'm relying on my memory and the file in this case, but I do not remember and I think the file supports that, that he ever did argue that there was an agreement that jurisdiction would be in Michigan. Obviously, that would have been something as such that, in all probability, would have kept jurisdiction here in this County. It certainly would have been cause to appeal if I would have wrongly decided on that issue. And again, I have no memory of it other than what plaintiff has said here today, so I am assuming he did not raise that. And if he did and I ruled incorrectly, certainly did not ask for reconsideration or appealed that decision.

10

Also, relying on the pleadings and comments, Mr. Plachta was not truthful to the Court. My memory there also is that he was given opportunity after opportunity to substantiate what he said to the Court, and part of that was because I could not believe that he would be lying to the Court, and by that wanted to give him every opportunity to show that he was not lying, even though it certainly did appear at the time that he was not being truthful. As such by that his conduct was not even that what I would expect from a first year lawyer, let alone someone who was experienced, let alone with his experience and expertise. Having said that, exemplary damages would be appropriate whether he be an experienced lawyer or a first year lawyer based upon his failure to even act in a minimum way so far as representing his client, and then also by that his false representations to the Court, his efforts to mislead the court, and by that the ruination of his client's case.

In determining the amount of damages, the Court is relying on that conduct, but also on the effect that it has had on Mr. Zarkowski. I accept his testimony as to the effect it has had on his reputation and his ability to operate both his professional and personal life in this community. I think it has – a community such as ours, a significant impact when something like this happens. And the tendency is not always just to blame counsel, but blame everybody. And it is a reality of life that this sense of counsel can also be placed on the parties and vice-versa. I also do attach great significance to the stress that this must have had on Mr. Zarkowski, and the contribution towards his divorce. I – I appreciate your honesty in that respect that you are not blaming him for everything that contributed or led to your divorce. But I can certainly see how the stress and the effect this would have had on you, personally and professionally, would have also contributed to the divorce, and certainly contributed to the breakdown of the marriage relationship.

I realize that exemplary damages are not to punish, but I don't believe I am doing so in this case. I am taking into consideration that Mr. Plachta was an experienced attorney, and by that in receipt of a good income on an annual basis, and by that take into consideration Mr. Zarkowski's circumstances, and to me a fair amount in that regards is the $500,000.00 for exemplary damages.

(Tr., Page 11, Lines 16 - 25, Pages 12 - 19, Lines 1 - 25)

These amounts were set forth in the judgment entered in Circuit Court Case No. 2. Subsequently, the Defendant filed a petition seeking relief under Chapter 7 of the Bankruptcy Code with this Court.

At the April 26, 2013, hearing, the Defendant testified that he had many cases in front of Judge Hoort and generally enjoyed a good relationship with Judge Hoort until he filed a motion in a domestic relation action which Judge Hoort denied. Afterward, the Defendant testified that Judge Hoort took a different attitude with him and treated the Defendant differently.

11

Law

Summary Judgment Standard

Federal Rule of Civil Procedure 56 is made applicable in its entirety to bankruptcy adversary proceedings by Federal Rule of Bankruptcy Procedure 7056. Federal Rule of Bankruptcy Procedure 7056(c) provides that summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See Choate v. Landis Tool Co.*, 46 F. Supp. 774 (E.D. Mich. 1980). The moving party bears the burden of showing the absence of a genuine issue of material fact as to an essential element of the non-moving party's case. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472 (6th Cir. 1989) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)). The burden then shifts to the nonmoving party once the moving party has met its burden, and the nonmoving party must then establish that a genuine issue of material fact does indeed exist. *Janda v. Riley-Meggs Industries, Inc.*, 764 F. Supp 1223, 1227 (E.D. Mich. 1991).

Section 523(a)(6)

111 U.S.C. § 523(a)(6) authorizes a Bankruptcy Court to exclude a debtor from receiving a discharge "from any debt for willful and malicious injury by the debtor to another entity or the property of another entity." The exceptions to discharge are to be narrowly construed in favor of the debtor. *Monsanto Co., v. Trantham (In re Trantham)*, 304 B.R. 298 (B.A.P. 6th Cir. 2004) (citing *Meyers v. I.R.S.*, 196 F.3d 622 (6th Cir. 1999)); *see also Walker v. Tuttle (In re Tuttle)*, 224 B.R. 606, 610 (Bankr. W.D. Mich. 1998) ("Courts will narrowly construe the language of § 523 to assure the debtor has an opportunity for a fresh start.") A party must prove by a preponderance of

12

the evidence that a debtor committed an injury that is both willful <u>and</u> malicious. *Grogan v. Garner*, 498 U.S. 279 (1991).

In *Kawaauhau v. Geiger*, 523 U.S. 57 (1998), the United States Supreme Court discussed and determined the meaning of the language used in 11 U.S.C. § 523(a)(6). The issue before the United States Supreme Court involved "whether a debt arising from a medical malpractice judgment attributable to negligent or reckless conduct" fell within 11 U.S.C. § 523(a)(6). *Id*. at 59. The Kawaauhaus argued that the malpractice award fell within the Section 523(a)(6) exception because Dr. Geiger engaged in the intentional act of providing inadequate medical services which led to Mrs. Kawaauhau's injury. *Id*. at 61.

In analyzing the parameters of the language "willful and malicious injury," the United States Supreme Court found that:

> [T]he word "willful" in (a)(6) modifies the word "injury," indicating that nondischargeability takes a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury. Had Congress meant to exempt debts resulting from unintentionally inflicted injuries, it might have described instead "willful acts that cause injury." Or, Congress might have selected an additional word or words, i.e., "reckless" or "negligent," to modify "injury." . . . [T]he (a)(6) formulation triggers in the lawyer's mind the category "intentional torts," as distinguished from negligent or reckless torts. Intentional torts generally require that the actor intend "the *consequences of an act*," not simply "*the act itself*."

*Id.* at 61-62 (quoting Restatement (Second) of Torts § 8A, Comment a, p. 15 (1964)).

The United States Supreme Court further determined that to adopt the interpretation proposed by the Kawaauhaus would:

> place within the excepted category a wide range of situations in which an act is intentional, but injury is unintended, i.e., neither desired nor in fact anticipated by the debtor. . . . A "knowing breach of contract" could also qualify. A construction so broad would be incompatible with the 'well-known guide that exceptions to discharge

13

"should be confined to those plainly expressed.'

*Id*. at 62 (quoting *Gleason v. Thaw*, 236 U.S. 558, 562 (1915)).

More than a year later, the Sixth Circuit Court of Appeals considered the "willful and malicious injury" language contained in § 523(a)(6), in *Markowitz v. Campbell (In re Markowitz)*, 190 F.3d 455 (6th Cir. 1999). The Sixth Circuit Court of Appeals interpreted *Geiger* and noted that:

> [t]he [Supreme] Court's citation to the Restatement's definition of "intentional torts" underscores the close relationship between the Restatement's definition of those torts and the definition of "willful and malicious injury." The Restatement defines intentional torts as those motivated by a desire to inflict injury or those substantially certain to result in injury. Although the Supreme Court identified a logical association between intentional torts and the requirements of § 523(a)(6), it neither expressly adopted nor quoted that portion of the Restatement discussing "substantially certain" consequences.

*Id*. at 464.

Based on the language used and analysis of the United States Supreme Court in *Geiger*, the *Markowitz* Court announced the standard of the Sixth Circuit by holding that:

> unless 'the actor desires to cause [the] consequences of his act, or . . . believes that the consequences are substantially certain to result from it,' he has not committed a "willful and malicious injury" as defined under § 523(a)(6).

*Id*. (quoting Restatement (Second) of Torts § 8A, at 15 (1964)); *see Kennedy v. Mustaine*, 249 F.3d 576, 580 (6th Cir. 2001).

In addition to proving a willful injury, a party must also prove that the debtor committed a malicious injury. "'Malicious' means in conscious disregard of one's duties or without just cause or excuse; it does not require ill-will or specific intent." *Wheeler v. Laudani*, 783 F.2d 610, 615 (6th Cir. 1986) (citing *Tinker v. Colwell*, 193 U.S. 473, 486 (1904)). If a party fails to prove either willful or malicious, the debt will be discharged. *Markowitz*, 190 F.3d at 463. Inferences can be made, however, if the circumstances surrounding the alleged injury warrant such:

14

> Determining whether a debtor acted both willfully and maliciously for purposes of § 523(a)(6) requires an examination of that person's state of mind. A debtor will rarely, if ever, admit to acting in a willful and malicious manner . . . [but] both requirements can be inferred through the circumstances surrounding the [involved] injury.

*O'Brien v. Sintobin*, 253 B.R. 826, 831 (Bankr. N.D. Ohio 2000).

Section 523(a)(6) "triggers in the lawyer's mind the category 'intentional torts.'" *Geiger*, 523 U.S. at 62. Debts that have been determined to fall under Section 523(a)(6) have involved: defamation, malicious prosecution and abuse of process, legal malpractice, libel, patent infringement, intentional infliction of emotional distress, and usurpation of corporate business opportunity. *See Kennedy*, 249 F.3d at 576 (defamation); *Markowitz*, 190 F.3d at 455 (legal malpractice); *Abbo v. Rossi, McCreery & Assocs., Inc. (In re Abbo)*, 168 F.3d 930 (6th Cir. 1999) (malicious prosecution and abuse of process); *Wheeler*, 783 F.2d at 610 (state court libel judgment); *In re Trantham*, 304 B.R. at 298 (pre-petition patent infringement judgment); *Gonzalez v. Moffitt*, 252 B.R. 916 (B.A.P. 6th Cir. 2000) (intentional infliction of emotional distress); *Digital Commerce, Ltd., v. Sullivan*, 305 B.R. 809 (Bankr. W.D. Mich. 2004) (usurpation of corporate business opportunity).

<u>Analysis</u>

Ordinarily, mere acts of negligence, such as the failure to pay a case evaluation fee, prepare or file case evaluation briefs, or attend hearings would not be the basis to determine that a debt is excepted from discharge. As the above cases hold, knowledge or intent is required before debts arising out of the actions are excepted from discharge. To hold otherwise would be to establish a standard that would frustrate one of the purposes of a fresh start as promised by Chapter 7. Additionally, such a holding would burden a professional to a higher unwarranted standard than applied to other individuals.

15

In this case, however, a review of the record in Circuit Court Case No. 1 reveals to this Court that the Defendant knew full well that the case evaluation fees had not been paid, that Judge Hoort had not seen a case evaluation summary, and that Judge Hoort was not convinced that there was a requisite family emergency to excuse the Defendant's attendance at the case evaluation hearing. If the Defendant did not realize that prior to the June 15, 2007, order to show cause hearing, he certainly should have had that knowledge at the conclusion of that hearing. Moreover, as stated by Judge Hoort at the June 15, 2007, hearing, Mr. Plachta was to provide the necessary documents at least seven days prior to the rescheduled hearing.

Instead of doing so, on the day of the rescheduled hearing, the Defendant supplied a document that was signed by his wife explaining the nature of her father's medical condition. The Court understands the sensitivity of personal medical information, and it appears that Judge Hoort did as well. What Judge Hoort did not understand, however, was why the Defendant had not paid the case evaluation fees, and why the proferred case evaluation summary was seven sentences long. It also becomes apparent on review of the August 14, 2007, hearing that Judge Hoort had serious doubts about the veracity and credibility of the Defendant's statements to the Court.

As early as the conclusion of the June 15, 2007, hearing, the Defendant knew exactly what had to be done to avoid dismissal of the Plaintiff's claims in Circuit Court Case No. 1 and to avoid the imposition of fees and costs. Despite that knowledge, the Defendant did not take the requisite action and the result that was foreshadowed on June 15, 2007, did indeed occur.

The Court has carefully considered the Defendant's testimony of April 25, 2013. Analyzed in one fashion, it appears that Judge Hoort had some conflicts with the Defendant such that the Defendant felt that he was being unfairly singled out in subsequent cases. If true, and with the factual setting as set in this case, the Defendant would have been on a heightened awareness that

anything that he did would open the door for Judge Hoort to dismiss Circuit Court Case No. 1 if any opportunity arose. With this knowledge, the Defendant's actions clearly resulted in the dismissal of Circuit Court Case No. 1.

Analyzed otherwise, the standards of practice before Judge Hoort were such that any practicing attorney knew that compliance with Court orders and directions needed to be followed. In that regard, the transcripts of the June 15 and August 14, 2007, hearings clearly demonstrate that a written order of the Circuit Court existed and that dismissal was a known and possible remedy for failure to either pay the case evaluation fees or submit case evaluation summaries.

Either way, the Defendant had the requisite knowledge that the failure to pay the fees and submit the summaries would undoubtedly result in dismissal of the Plaintiff's claims in Circuit Court Case No. 1. From that failure, part of the judgment in Circuit Court Case No. 2 in the amount of $100,012.46 is excepted from discharge pursuant to 11 U.S.C. § 523(a)(6).

As for the remaining $500,000 of exemplary damages, the Court has concerns as to the propriety of that amount as being excepted from discharge. First, the record in Circuit Court Case No. 2 is at best incomplete as it appears that Judge Hoort merely heard some statements from the Plaintiff and then awarded $500,000. Second, the transcript of the March 5, 2009, hearing contains portions that support the Plaintiff's assertions that the Defendant's conduct at the hearings were the basis for the award of $500,000. However, the Montcalm County Circuit Court's decision also included findings that the Defendant failed to address the jurisdictional challenges raised in Circuit Court Case No. 1. Moreover, that Court also considered the effect all of the Defendant's actions had on the Plaintiff. Third, the parties in this case have not had an opportunity to completely explore and brief this issue. The Plaintiff cites the case of *In re Abbo*, 168 F.3d 930 (6th Cir. 1999), which holds that punitive damages stem from the same willful and malicious injury as the non-

17

dischargeable compensatory damages. In *Abbo*, a judgment arose out of an Ohio state court action after a jury trial that awarded $6,720 in actual damages and $10,000 in punitive damages for malicious prosecution and $1,700 in actual damages and $40,000 in punitive damages for abuse of process. The defendant in the Ohio state court action then filed a Chapter 7 bankruptcy petition and the judgment creditors filed an adversary proceeding against him to determine whether the judgment debt was dischargeable under 11 U.S.C. § 523(a)(6). The bankruptcy court held that the debt was nondischargeable because "the § 523(a)(6) exclusion issue was preclusively determined by the [s]tate [c]ourt's judgment." *Abbo*, 168 F.3d at 931. The United States District Court for the Northern District of Ohio upheld the bankruptcy court's judgment. On appeal, the Sixth Circuit Court of Appeals held that the underlying proceedings in the state court and the state court's judgment "fully and necessarily determined that the defendant's debt stemmed from a 'willful and malicious injury' as provided by the Bankruptcy Code." *Id.* Here, at first blush, the amount of the exemplary damages far exceeds the compensatory damages. Second, Judge Hoort's decision is uncertain and unclear as to whether the exemplary damages arose out of actions taken by the Defendant which the Court in this Opinion holds to be excepted from discharge or whether other actions were considered.

Given the record in this case, the Court will continue this matter to allow the parties to consider the necessary steps to determine whether the $500,000 of exemplary damages should be excepted from discharge.

The Court will schedule a telephonic status conference on **Thursday, September 5, 2013, at 11:00 a.m.** to establish deadlines and procedures to address this remaining issue.

Not for Publication.

18

12-02120-dob    Doc 47    Filed 08/09/13    Entered 08/09/13 16:15:52    Page 18 of 19

**Signed on August 09, 2013**

                                                       **/s/ Daniel S. Opperman**
                                                       **Daniel S. Opperman**
                                                       **United States Bankruptcy Judge**